UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x
                                                                         :     08 Civ. 5048 (HB)
**In re GILDAN ACTIVEWEAR, INC.**                                        :
**SECURITIES LITIGATION**                                                :     OPINION & ORDER
                                                                         :
-------------------------------------------------------------------------x
                                                                         :
**This Document Relates To:**                                            :
**ALL ACTIONS**                                                          :
                                                                         :
-------------------------------------------------------------------------x

**Hon. HAROLD BAER, JR., United States District Judge:**

Plaintiffs, purchasers of the common stock of Gildan Activewear, Inc. ("Gildan" or the "Company") between August 2, 2007 and April 29, 2008 (the "Class Period"), brought this putative class action against Gildan and two of its officers and directors – Glenn Chamandy ("Chamandy") and Laurence Sellyn ("Sellyn") (collectively, the "Individual Defendants") – alleging violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934.[1]  Plaintiffs filed a Consolidated Amended Class Action Complaint (the "Complaint") on November 17, 2008.  Defendants moved to dismiss the Complaint pursuant to the Private Securities Litigation Reform Act ("PSLRA") and Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  For the reasons set forth below, Defendants' motion to dismiss is granted.

## I.  FACTUAL BACKGROUND

Gildan, headquartered in Montreal, Canada, is a leading supplier of activewear for the wholesale imprinted sportswear market in the United States, Canada and Europe.  Compl. ¶ 17, 40.  The company's core wholesale business consists of the manufacture and distribution of activewear "blanks," namely T-shirts, fleece and sports shirts that are produced and sold in large quantities to wholesalers to be subsequently customized by screen printers with designs and logos.[2]  *Id.*  Gildan was incorporated as a private company in May 1984 and completed an initial public offering on June 17, 1998.  *See* 2007 Form 40-F (App. 8) at 1.  Its common stock is listed and traded on the New York Stock Exchange and the Toronto Stock Exchange.  *See* Compl. ¶ 17.

---

[1] Three separate securities fraud lawsuits were initially filed against Gildan; these actions were consolidated before this Court on September 16, 2008.

[2] As described in further detail below, Gildan also acquired Kentucky Derby Hosiery ("KDH") to enable it to expand into the sock and hosiery business.

1

**Problems in the Dominican Republic Manufacturing Facility**

  Historically, Gildan had manufactured its products primarily in facilities in Canada and the United States; however, in an effort to reduce costs, Gildan opened a textile facility in Honduras in 2002 and a second facility in the Dominican Republic in 2005.  Compl. ¶ 44.  The Honduras and Dominican Republic facilities initially manufactured relatively simple products, but in March 2007, Gildan transferred its primary manufacturing capacity to the Dominican facility, where it began to manufacture more technically advanced products, such as ring-spun cotton polo shirts.  *Id.* ¶¶ 4, 44.  Plaintiffs allege that the Dominican facility encountered regular maintenance issues and problems with production from the time the plant's equipment was first installed in 2005 and 2006.  *Id.* ¶ 55.  However, these issues came to a head when Gildan began to transfer additional production to the Dominican facility in 2007.  Plaintiffs allege that, unbeknownst to investors, soon after the primary manufacturing business was transferred to the Dominican facility, it began to experience severe production problems and struggled with chronic issues such as layoffs and employee turnover, ineffective management, unrealistic production goals, machine failure and malfunctions and environmental issues.  *Id.* ¶¶ 59-63.  By May 2007, Gildan's headquarters began closely to oversee the Dominican facility and sent additional Canadian managers to oversee the management at the plant.  *Id.* ¶ 47.  A restructuring of management and staff followed, leading to layoffs and the replacement of certain management.  *Id.* ¶¶ 48-50.  The Dominican facility continued to have problems with its equipment, but "management repeatedly misdiagnosed the problems as technical rather than maintenance issues."  *Id.* ¶ 56.

  In approximately November 2007, in response to these problems, Gildan instituted a "crisis management restructuring" plan, which led to even closer monitoring of the management and production of the Dominican plant.  *See id.* ¶¶ 57-61, 66-70.  Ultimately, Plaintiffs allege the Dominican facility "was not efficient" compared to the Honduras facility and could not "absorb the additional capacity demands resulting from the transfer of North American capacity to the facility."  *Id.* ¶ 64, 72.  Plaintiffs do not, however, allege that the facility failed to meet production goals or that Gildan ever failed to meet earnings forecasts prior to the first quarter of 2008.  In fact, throughout the period during which the Dominican facility was experiencing these major problems, Gildan posted record profits every quarter and met or exceeded its earnings projections throughout the 2007 fiscal year and the first quarter of fiscal year 2008.  *See* 5/7/08 Trans. (App. 15) at 2, 3.

**Integration with Kentucky Derby Hosiery**

In the midst of setting up its operations at the Dominican facility, Gildan announced on July 6, 2006 that it had acquired Kentucky Derby Hosiery ("KDH"), a North American specialty hosiery company.  Compl. ¶ 74.  KDH's business centered largely on the sale of specialized sock products (*i.e.*, socks imprinted with logos, mascots and the like) to major retailers.  *Id.* ¶ 75.  Gildan's continued production of only generic sock products after acquiring KDH impaired its relationship with a number of KDH's largest customers.  *See id.* ¶ 77.  As a result, Gildan was left holding millions of dollars of inventory that it could no longer sell and that had to be carried at the lower of cost or market value.  *Id.* ¶ 78.  Plaintiffs allege that at least by January 30, 2008, Gildan knew that it needed to write-down the inventory it was unable to sell, but that it did not announce the write-down until April 29, 2008.  *See id.*; *id.* ¶¶ 113, 124.  Also, Gildan faced difficulties and incurred costs in relation to the integration of KDH's computer systems with its own, resulting in some missed or improperly entered orders and additional shipping and restocking costs.  *Id.* ¶ 79, 120.

**Gildan's Statements Regarding Earnings Projections and Dominican Facility Issues**

On August 2, 2007, Gildan issued a press release announcing its fiscal third quarter 2007 results and its initial earnings guidance for fiscal year 2008.  *Id.* ¶ 81.  In that announcement, Gildan stated that it had "initiated its [earnings per share] guidance for fiscal 2008 with a range of U.S. $1.80 – U.S. $1.85 per share . . . up approximately 39-40% from fiscal 2007."  *Id.*  The press release added that "[t]he projected growth in [earnings per share] in fiscal 2007 is driven primarily by the impact of relocating the Canadian textile operations and completing the ramp-up of the Company's offshore textile facilities in Honduras and the Dominican Republic, unit volume growth in activewear, and the expected EPS accretion from having completed the integration of [KDH]."  *Id.*  Sellyn then held a conference call with analysts, in which he reiterated cost savings the Company would obtain as a result of moving its production offshore and its integration with KDH.  *Id.* ¶ 82.  Sellyn also emphasized "improved efficiencies" in the Dominican and Honduran facilities, "where [the Company] experienced some short-term operating issues in the third quarter."  *Id.*  On August 7, 2007, Gildan filed its Form 6-K quarterly report for the period ending July 1, 2007, which stated that the Dominican facility was "running at a comparable scale of production to [Gildan's] mature textile facility in Honduras" and that the Company would "continue to maximize production levels and cost efficiencies at the Dominican Republic facility during the balance of fiscal 2007."  *Id.* ¶ 85.

On September 18, 2007, Gildan issued another press release announcing, among other things, an increase in its fiscal year 2008 earnings guidance.  *Id.* ¶ 87.  Specifically, Gildan

3

announced that it "now expects to achieve or exceed the high end of its previously announced earnings guidance range for fiscal 2008 of U.S. $1.80-$1.85 per share, representing an increase of over 40% compared with the Company's fiscal 2007 projected EPS of approximately U.S. $1.30 before restructuring charges." *Id.* After this announcement was made, Gildan's stock rose $4.25 per share, or 13%, to close at $35.92 per share. *Id.* ¶ 88.

On December 6, 2007, Gildan announced its financial results for fiscal fourth quarter and year-end of 2007, the period ending September 30, 2007. *Id.* ¶ 90. Among other results, the Company "reconfirmed its previous EPS guidance for fiscal 2008 of U.S. $1.85 per share, up 43% from U.S. $1.29 per share . . . in fiscal 2007." *Id.* In a conference call the same day, Sellyn noted additional problems with the Dominican facility, but assured investors that the problems had been corrected. *Id.* ¶ 93. He stated that "[a]lthough [Gildan] achieved [its] projected EPS growth, EBITDA was lower than previously projected for three reasons," one of which was the Company's being "unable to fully capitalize on market demand for high-volume hooded fleece and golf shirts as a result of temporary inventory constraints due to transitioning our Canadian textiles to . . . the Dominican Republic." *Id.* During the conference call, an analyst asked Sellyn whether the below-expectation EBITDA was "all behind [Gildan] now" or whether the market "could . . . see some of that Canadian production transition still affecting margins going into the next quarter." *Id.* ¶ 95. Sellyn responded by assuring investors that "everything is running at 100% and that's all behind us" and that the Company believed it was "well positioned to achieve or exceed [its] growth projections for fiscal 2008." *Id.* On December 19, 2007, Gildan filed its Form 40-F Annual Report for fiscal year 2007. In the Annual Report, Gildan stated that the production at the Dominican facility was "running at a comparable scale of production to our mature textile facility in Honduras." *Id.* ¶ 98.

On January 15, 2008, Gildan issued a press release stating that it "continue[d] to be comfortable with its most recent EPS guidance, . . . and confirm[ed] that it expect[ed] to achieve or exceed its EPS guidance of U.S. $0.21 for the first quarter of fiscal 2008." *Id.* ¶ 101. This position was reiterated at a conference on January 16, where Sellyn noted that the earnings guidance largely was driven by anticipated cost savings resulting from the transfer of production capacity to lower-cost production centers in the Dominican Republic and Honduras. *Id.* ¶ 104. On January 30, 2008, Gildan issued another press release to announce its financial results for the fiscal first quarter of 2008, for the period ending December 30, 2007. *Id.* ¶ 106. In that announcement, the Company increased its earnings guidance to between $1.85 and $1.90 for fiscal year 2008. *Id.* On February 11, 2008, Gildan filed its Form 6-K quarterly report for the period ending December 30, 2007, in

4

which it again stated that the Dominican Republic facility was "currently running at a comparable scale of production to our mature textile facility in Honduras." *Id.* ¶ 111.

**Sales of Stock by Defendants Chamandy and Sellyn**

Between June and December 2007, Defendant Chamandy, Gildan's CEO and member of its board of directors, sold 3.6 million shares of his personally-held Gildan stock, of which almost 2.5 million shares were sold during the Class Period. Over two days in December 2007, Defendant Sellyn, Gildan's CFO and member of its board of directors, sold 20,000 shares of his Gildan stock. *Id.* ¶¶ 100, 132-34. The Individual Defendants' sales of shares amounted to gross proceeds in excess of a combined $96 million during the Class Period. *Id.* ¶¶ 132-33.

**Gildan's Reduction of Fiscal 2008 Earnings-Per-Share Guidance**

On April 29, 2008, Gildan issued a press release reducing its earnings guidance from $0.42 per share to $0.35 per share for the second fiscal quarter 2008 and from $1.85-$1.90 per share to $1.45-$1.50 per share for the full fiscal year 2008. *Id.* ¶ 113. The Company stated it had had "lower than anticipated growth in the second fiscal quarter . . . primarily due to lower than projected unit sales growth in activewear as a result of a shortfall in production for the Dominican Republic textile facility, a write-down of inventories of discontinued retail product-lines pursuant to the rationalization of Gildan's product-mix within the sock category, and additional costs incurred to service mass-market retailers during integration of retail information systems." *Id.* That is, Gildan's announcement placed the blame for its reduced earnings guidance on the problems at the Dominican facility as well as the problems that arose after the Company acquired KDH, the North American hosiery company, in July 2006. That day, April 29, Gildan's stock prices fell $10.99 per share, or 30%, to close at $24.93. *Id.* ¶ 116. A week later, on May 7, 2008, Gildan announced actual earnings consistent with its revised earnings guidance. *Id.* ¶ 117. On a conference call with analysts, Defendant Chamandy acknowledged that "[t]he bulk of the problems really occurred in March," and that the problems initially were not believed to be material, but were subsequently found "to be greater than [Gildan] anticipated." *Id.* ¶ 126.

## II.  LEGAL STANDARD

To survive a motion to dismiss, a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court must accept the facts alleged in the complaint as true, even if doubtful, and draw all

reasonable inferences in favor of the nonmoving party. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). The Court must apply a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007). This standard requires "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).[3]

A securities fraud claim must also satisfy the heightened pleading requirements of the PSLRA and Rule 9(b) by stating with particularity the circumstances constituting fraud. *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citations omitted). To comply with Rule 9(b), a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). Under the PSLRA, a complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1), (2). Thus, although courts "normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA*, 553 F.3d at 196 (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008)) (internal quotation marks omitted). As the Supreme Court recently noted, Congress included "[e]xacting pleading requirements . . . among the control measures" in the PSLRA to act "[a]s a check against abusive litigation by private parties." *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).

---

[3] In deciding a motion to dismiss, a court may consider documents attached as exhibits to the complaint or incorporated into the complaint by reference, documents that are integral to the plaintiff's claims, even if not explicitly incorporated by reference, and matters of which judicial notice may be taken. *See De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991), *cert. denied*, 503 U.S. 960 (1992); *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991); *Thomas v. Westchester County Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). In a securities fraud case, courts may also "take judicial notice of and consider the contents of documents that are required by law to be filed with the SEC." *In re Bausch & Lomb, Inc. Sec. Litig.*, 592 F. Supp. 2d 323, 338 (W.D.N.Y. 2008) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

### III.  DISCUSSION

**A.     PSLRA Standards**

Plaintiffs' principal claims are brought under section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).  This provision makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may proscribe."  *Id.*  Rule 10b-5, which implements the statute, prohibits "mak[ing] any untrue statement of a material act or [omitting] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b) (2008).  To state a claim for securities fraud under § 10(b) and Rule 10b-5, a plaintiff must allege (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 446, 341-42 (2005).

**B.     Scienter**

As noted, the PSLRA requires a plaintiff to plead with particularity facts giving rise to a strong inference of scienter, *i.e.*, the defendant's intent to deceive, manipulate or defraud.  *See Tellabs*, 551 U.S. at 313.[4]  As the Court held in *Tellabs*, to constitute a "strong inference," an inference of scienter must be "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S. at 314.  To determine whether a strong inference of scienter is raised, "courts must consider both the inferences urged by the plaintiff and any competing inferences rationally drawn from all the facts alleged, taken collectively."  *ECA*, 553 F.3d at 198.  Thus, a court must ask, "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Tellabs*, 551 U.S. at 326.  Scienter can be established by alleging sufficient facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness.  *E.g.*, *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168-69 (2d Cir. 2000)).

    *1.     Motive and Opportunity*

To allege Defendants' motive sufficient to raise a strong inference of scienter, Plaintiffs must allege "concrete benefits that could be realized by one or more of the false statements and

---

[4] In addition to intent, recklessness is a sufficiently culpable mental state for securities claims in this Circuit.  *ECA*, 553 F.3d at 198 (citing *Teamsters*, 531 F.3d at 194).

7

wrongful nondisclosures alleged." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). "General allegations that defendants acted in their economic self-interest are not enough." *Ganino*, 228 F.3d at 170. In this case, the sole facts on which Plaintiffs rely to allege motive are that Defendants Chamandy and Sellyn sold a substantial number of their shares in Gildan during or shortly before the Class Period. *See* Compl. ¶¶ 100, 132-34. However, "[t]he mere fact that insider stock sales occurred does not suffice to establish scienter." *In re Bausch & Lomb*, 592 F. Supp. 2d at 334. Rather, to satisfy this element, Plaintiffs must establish that the sales were "unusual" or "suspicious." *See, e.g.*, *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995); *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865 (HB), 1998 U.S. Dist. LEXIS 8061, at *18 (S.D.N.Y. June 1, 1998) ("Unusual insider trading activity during the class period may permit an inference of scienter; however, plaintiffs bear the burden of showing that any such sales are in fact unusual."). "Insider stock sales are unusual where the trading was in amounts dramatically out of line with prior trading practices and at times calculated to maximize personal benefit from undisclosed inside information." *In re Glenayre Techs., Inc. Sec. Litig.*, No. 96 Civ. 8252 (HB), 1998 U.S. Dist. LEXIS 20344, at *11 (S.D.N.Y. Dec. 30, 1998), *aff'd*, *Kwalbrun v. Glenayre Techs., Inc.*, 201 F.3d 431 (2d Cir. 1999); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74-75 (2d Cir. 2001). Further, total sales amounting to a relatively low percentage of an insider's percentage of stock holdings militate against an inference of scienter. *See, e.g.*, *Acito*, 47 F.3d at 54 (sale of 11% of defendant's holdings not unusual); *In re Glenayre*, 1998 U.S. Dist. LEXIS 20344 at *12 (no inference of scienter where sales represented 5% of cumulative stock holdings); *In re Health Mgmt.*, 1998 U.S. Dist. LEXIS 8061 at *18 & n.3 (sales during class period ranging from 3% to 81.9% of holdings not suspicious when viewed in light of other relevant factors).

     Plaintiffs allegations fail to raise the requisite strong inference of scienter based on the Individual Defendants' motive and opportunity. First, the value and volume of shares that the Individual Defendants sold as compared to their total holdings was not unusual and does not raise a strong inference of scienter. While Plaintiffs allege that the Individual Defendants' insider sales amounts to $96 million in gross proceeds during the Class Period, they fail to allege any facts relating to the amount of profit the Individual Defendants garnered from their sales. See In re Scholastic, 252 F.3d at 74-75. The Individuals Defendants' sales were also relatively small in volume compared to overall holdings. Taking into account their complete portfolios of shares, the

8

stock sales amounted to only 22.5% and 4.9% of Chamandy's and Sellyn's holdings, respectively.[5] Moreover, all insider sales alleged in the Complaint occurred on or before December 21, 2007, far in advance of the January 30 press release increasing the earnings projections and the April 29 announcement allegedly revealing the "truth" about the Company's problems. Thus, Plaintiffs' allegations are empty vessels, as the trades occurred weeks before the principal allegation of material misstatement, and many months before the release of any negative information that caused Gildan's stock price to plummet. *See, e.g.*, *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, (S.D.N.Y. 2008) (lapse of "approximately four months between these substantial sales and the revelation of the alleged falsity[] inescapably attenuates any inference of scienter"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 385 (E.D.N.Y. 2003) (finding four- to six-week gap between stock sales and release of negative information not indicative of suspicious trading in light of other relevant factors).

Further, Plaintiffs have alleged insider trading by only two Gildan insiders; the absence of any allegations of other insider trades before Gildan announced the impact of the issues at the Dominican facility and the KDH integration undercuts any finding of the requisite strong inference of scienter. *See In re Glenayre*, 1998 U.S. Dist. LEXIS 20344 at *13; *In re Health Mgmt.*, 1998 U.S. Dist. LEXIS 8061 at *18; *see also Acito*, 47 F.3d at 54 ("The fact that [other insiders] did not sell their shares during the relevant class period undermines plaintiffs' claim that defendants delayed notifying the public 'so that they could sell their stock at a huge profit.'") (citations

---

[5] Plaintiffs allege in their Complaint that "Chamandy sold 25% of his total holdings of Gildan Common Stock and Defendant Sellyn sold 53% of his total holdings." Compl. ¶ 134. Gildan's SEC filings reveal that after Chamandy sold his shares, his total beneficial ownership was approximately 7.5 million shares; Sellyn's beneficial ownership totaled approximately 386,000 shares. *See* 12/20/07 Form 6-K (App. 7) at 23, 26. Thus, taking into account the Individual Defendants' total beneficial ownership in the Company, their sales constituted a substantially smaller portion of their holdings than Plaintiffs allege. These figures of total shareholdings include restricted stock and exercisable and unexercisable options. There appears to be some disagreement among the courts of this Circuit, as well as in other jurisdictions, regarding whether it is appropriate to take into account options when calculating volume of sales relative to total shareholdings, and if so, whether courts should consider unvested as well as vested options. *Compare Acito*, 47 F.3d at 54 (calculating volume of shareholdings by including unexercisable options); *In re Espeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, (S.D.N.Y. 2006) (counting vested, but not unvested, options); *In re Keyspan*, 383 F. Supp. 2d at 383 (taking into account defendant's shares purchased through options); *with In re EVCI Colleges Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006) (finding vested but unexercised options are not shareholdings); *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999) (finding vested options are not shares and should not be considered in volume of shareholdings); *see also Rothman*, 220 F.3d at 94 (calculating volume of shareholdings by including all shares beneficially owned); *In re Astea Int'l Inc. Sec. Litig.*, No. 06-1467, 2007 U.S. Dist. LEXIS 58238, at *42-44 & n.18 (E.D. Pa. Aug. 7, 2007) (explaining relevance of accounting for vested and unvested options in insider's shareholdings). While the Second Circuit has not spoken explicitly to this issue, it appears that the weight of the authority, including the Second Circuit's implicit reasoning in *Acito*, lends credence to the position that options are to be taken into account in comparing the volume of an insider's sales to his shareholdings. However, even if these options were not taken into account – and if Chamandy's and Sellyn's trades did account for 25% and 53%, respectively, as Plaintiffs contend – based on the other relevant factors to be considered, I find that Plaintiffs have not adequately pled that the trades in question in this case were "unusual."

omitted). The Complaint alleges that the Dominican facility was closely overseen by numerous executives from the Company's Canadian headquarters; Plaintiffs' silence as to any evidence of insider trading by these executives makes Plaintiffs' position even more tenuous. Finally, Chamandy's sales, which comprise over 99% of the total insider trading, both by volume and value, were made pursuant to a non-discretionary Rule 10b5-1 trading plan, which undermines any allegation that the timing or amounts of the trades was unusual or suspicious. *See, e.g.*, *Fishbaum v. Liz Claiborne, Inc.*, No. 98-9396, 1999 WL 568023, at *4 (2d Cir. 1999) (insider trades not unusual because, among other reasons, two defendants' stock sales were made pursuant to periodic divestment plans); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007) (trades under 10b5-1 plan "do not raise a strong inference of scienter"); *see also Elam v. Neidorff*, 544 F.3d 921, 928 (8th Cir. 2008) ("Stock sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were prescheduled and not suspicious."). In light of all the relevant factors, this Court finds that Plaintiffs have failed adequately to allege motive and opportunity sufficient for a finding of scienter.

### 2. *Recklessness*

When plaintiffs are unable to make the "motive" showing, they might nonetheless raise a strong inference of scienter under the "strong circumstantial evidence" prong, "though the strength of the circumstantial allegations must be correspondingly greater" if there is no motive. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted). To survive dismissal under this prong, plaintiffs "must show that they alleged reckless conduct by the [defendants], which is at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Honeyman v. Hoyt (In re Carter-Wallace, Inc. Sec. Litig.)*, 220 F.3d 36, 39 (2d Cir. 2000). To state a claim based on recklessness, plaintiffs may either "specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to check information they had a duty to monitor." *Montoya v. Mamma.Com Inc.*, 05 Civ. 2313 (HB), 2006 U.S. Dist. LEXIS 13207, at *17-18 (S.D.N.Y. Mar. 28, 2006) (quoting *Novak v. Kasaks*, 216 F.3d 300, 308, 311 (2d Cir. 2000)) (internal quotation marks and alterations omitted). Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information to indicate how it was inconsistent with the statements made. *Id.* at *18; *see also Teamsters*, 531 F.3d at 196; *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 52 (E.D.N.Y. 1998)

("To withstand a motion to dismiss, a plaintiff must detail specific contemporaneous data or information known to the defendant that was inconsistent with the representation in question."), *aff'd*, 189 F.3d 460 (2d Cir. 1999).  Importantly, the Second Circuit has "refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.'  Corporate officials need not be clairvoyant; . . . [t]hus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim for securities fraud." *Novak*, 216 F.3d at 309.  Moreover, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.*

       Plaintiffs' primary contention supporting an inference of recklessness is that Gildan was experiencing significant problems at its Dominican Republic plant that made it "impossible" or "patently unrealistic" for it to achieve its projected earnings, and that the Company's internal modeling should have made them aware of that fact.  *See* Compl. ¶¶ 83, 89, 92, 97, 103, 105, 107.  However, Plaintiffs do not allege any facts to suggest what those models revealed at the time, or what effect the models might have had on Gildan's financial results.  Thus, while it would be troubling if the Company had been aware that the problems at the Dominican facility contradicted their bullish comments about projected earnings, Plaintiffs have failed to allege with the requisite specificity exactly what contemporaneous data Defendants had, even to be able to suggest such knowledge.[6]  The Complaint's general allegations that, by virtue of their senior positions at Gildan, the Individual Defendants necessarily had access to nonpublic information, are insufficient to show recklessness under the law of this Circuit.  *See City of Brockton Ret. Sys. v. Shaw Group, Inc.*, 540 F. Supp. 2d 464, 473 (S.D.N.Y. 2008); *In re Health Mgmt.*, 1998 U.S. Dist. LEXIS 8061 at *17-18 ("[C]ourts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook.") (citations omitted); Compl. ¶¶ 21, 162.

       Moreover, Plaintiffs' allegations fail to plead any, let alone sufficient, facts supporting a finding of scienter based on problems associated with the KDH integration.  As noted above,

---

[6] Plaintiffs attempt to refute Defendants' contention that the Complaint lacks specific reports or statements containing contrary facts by pointing to ¶¶ 62-66.  However, those paragraphs merely contain generalities concerning the condition of the plant and conclusory statements that the Dominican facility was not, among other things, "efficient, nor was it ever able to absorb . . . additional capacity demands." *E.g.*, *id.* ¶ 64.  These allegations do not state what Defendants actually knew about these conditions, or specific data that was available to them, sufficient to withstand scrutiny on the recklessness prong of the scienter inquiry.

11

Plaintiffs allege that Gildan was required to write-down unsellable inventory and experienced delays and costs as a result of integrating KDH's computer system with its own platform. Plaintiffs contend that Gildan should have been aware of these integration problems and the need to write down inventory "at least . . . by the time Defendants issued their second quarter earnings guidance on January 30, 2008." *Id.* ¶ 124. Yet, the Complaint contains no allegations as to when those facts became known, or how or why Defendants should have learned of any developments that made the integration more costly than anticipated. Indeed, the integration allegations relate largely to Gildan having "alienated" customers by abandoning KDH's specialty hosiery business, but the Complaint contains no factual allegations relating to when this occurred, when or how the Company learned or should have learned of it, or the effect it had on Gildan's business. Plaintiffs point to the fact that Sellyns admitted two years after the acquisition that the transition did not run smoothly and had resulted in missed sales. *See id.* ¶ 120. However, as noted, scienter may not be established by hindsight, and these allegations do nothing to illustrate that Defendants knew or should have known at the time that the costs associated with the integration were inconsistent with their ambitious earnings guidance. Accordingly, the allegations surrounding KDH do not give rise to any inference of scienter.

## C.     Material Misrepresentation

Having found that Plaintiffs failed adequately to plead scienter, it is not strictly necessary to address whether the Complaint alleges material misstatements or omissions as required by the PSLRA. However, it is worth noting that corporate executives are entitled to express ordinary corporate optimism, or "puffery," without exposing themselves to liability under the PSLRA, as these "statements are too general to cause a reasonable investor to rely upon them." *E.g.*, *ECA*, 553 F.3d at 206; *see also Steinberg v. Ericsson LM Tel. Co.*, No. 07 CV. 9615 (RPP), 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008) (statements that the company would "continue to do well and gain market share and outperform the competition were, without more, simply expressions of confidence in the viability of [defendant's] future business which do not give rise to a securities violation"). Here, Gildan's statements that it would "continue to maximize production," Compl. ¶¶ 86, 99, 112, or was "leveraging the expertise" of its Honduran management team, *id.* ¶ 109, were simply vague expressions of optimism about the ability of the Dominican facility to ramp-up production. Indeed, although Plaintiffs allege the Dominican facility encountered difficulties in production and management from the time it opened in 2005, they never allege (nor can they) that these troubles affected Gildan's earnings or profits. Plaintiffs show no reason, therefore, why

Defendants could not maintain optimism about the Company's ability to continue its performance notwithstanding the troubles at the Dominican plant. Accordingly, the Complaint fails to allege sufficiently specific facts that show any actionable misrepresentations or omissions by the Defendants.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.[7] The Clerk of this Court is directed to close this motion and to close this case and remove it from my docket.

**IT IS SO ORDERED.**
New York, New York
July ___, 2009

_____
U.S.D.J.

---

[7] Having failed sufficiently to plead a primary violation of the Exchange Act, Plaintiffs' cause of action under § 20(a) is likewise dismissed. *See Ganino*, 228 F.3d at 170 ("To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff must show a primary violation . . . by the controlled person . . . .") (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).

13